IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| GLENN H. MEDLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CV 01-B-590-S |
| | ) |
| WARDEN BILLY MITCHEM and | ) |
| CAPTAIN HUBERT ETHERIDGE, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Glenn H. Medley, hereinafter referred to as plaintiff, has filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 alleging that rights, privileges, or immunities afforded him under the Constitution or laws of the United States have been abridged during his incarceration at William E. Donaldson Correctional Facility in Bessemer, Alabama. Plaintiff names as defendants Warden Billy Mitchem and Captain Hubert Etheridge. He seeks injunctive relief. In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(2), the complaint was referred to the magistrate judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

The magistrate judge ordered the defendants to respond to the plaintiff's request for a preliminary injunction and temporary restraining order. The defendants filed a response accompanied by the affidavits of defendants Billy Mitchem and Hubert Etheridge. Thereafter, the parties were advised that the defendants' response would be treated as a motion for summary judgment. The plaintiff filed a counter-affidavit and objection to the motion for summary judgment. (Document #16.)

## SUMMARY JUDGMENT STANDARD

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990), *cert. denied*, 498 U.S. 1103 (1991). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of

2

>proof. This rule facilitates the dismissal of factually unsupported
>claims prior to trial.

*Bennett v. Parker*, 898 F.2d at 1532 (citation omitted). However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Perry v. Thompson*, 786 F.2d 1093 (11th Cir. 1986).

## FACTUAL ALLEGATIONS

On February 23, 2001, Warden Billy Mitchem and Captain Hubert Etheridge instituted a new policy at William E. Donaldson Correctional Facility which prevents "inmates from assisting other inmates [with their legal] cases or they will receive a disciplinary." (Document #1 at 3.) Plaintiff contends that he is poor, inexperienced in the law, cannot afford to hire an attorney, and has been receiving legal assistance from another inmate. *Id.* at 4. At present, plaintiff desires the inmate's continued help with a pending Rule 32 petition in order to convince a court to reverse a conviction for which he received a sentence of life without parole. *Id.* at 5. He also points out that "the court will not and is not required by law to appoint counsel in a post-conviction petition." *Id.* at 4. Further, plaintiff states that there is no "alternative means for readdress (sic), the clerk's in the law library are untrained, the law library is inadequate a[nd] out dated and the Alabama D.O.C. doesn't provide any legal assistance service to train the clerk's who work in the law library and the access to court training program to train law clerks...was discontinued about ten- years ago." *Id.* at 5. As such, plaintiff contends his constitutional right to access to court has been and continues to be violated.

Plaintiff also seeks a temporary restraining order and preliminary injunctive relief to prevent the defendants from taking disciplinary action against him or transferring him to another

3

facility for attempting to seek legal assistance from other inmates. (Document #4.) He attached a copy of the policy regarding inmate-to-inmate assistance, which is as follows:

**PER WARDEN MITCHEM**

**EFFECTIVE IMMEDIATELY, THE LAW LIBRARY IS TO BE UTILIZED BY INMATES TO WORK ON THEIR <u>OWN INDIVIDUAL CASES</u>. INMATES THAT ARE FOUND TO BE WORKING ON CASES THAT ARE NOT THEIR OWN WILL BE SUSPENDED FROM COMING TO THE LAW LIBRARY AND SUBJECT TO DISCIPLINARY ACTION.**

**INMATES THAT UTILIZE THE LAW LIBRARY MUST HAVE A VALID PASS. INMATES FOUND UTILIZING THE LAW LIBRARY WITHOUT A VALID PASS WILL BE SENT BACK TO THEIR ASSIGNED UNIT. INMATES MAY SUBJECT THEMSELVES TO DISCIPLINARY ACTION IF THEY ARE FOUND IN VIOLATION OF THIS POLICY.**

**SIGNED - CAPTAIN HUBERT ETHERIDGE 2/23/01**

The magistrate judge ordered the Department of Corrections to respond to the plaintiff's allegations by giving "a complete description and explanation of the defendants' new policy and procedure with regard to the prohibition against inmate-to-inmate legal assistance." (Document #9.)

In its response, the Department contends that the purpose of its regulation is to "prevent inmates from charging other inmates for legal services. (Document #10 at 1-2.) The bartering for legal services presents enhanced risks of violence, extortion and other disciplinary problems throughout the facility. . . .[Moreoever,] space is limited and . . .access must therefore be controlled . . . ." Further, the Department argues that "inmates have access to the law library to

4

research their own cases six days a week and are allowed extended times if working on a deadline. . . .The law library is adequate and the authorized inmate law clerks work to assist other inmates with utilizing the books." *Id.* at 2-3. The defendants also urge the court to defer to prison officials when making this type of judgment, and assert that *Shaw v. Murphy*, 532 U.S. 223 (2001), has directly answered plaintiff's proposed inadequacies with the new policy because *Shaw* stands for the proposition that inmates do not have a constitutional right to provide legal assistance to other inmates. *Id.*

Plaintiff filed a counter-affidavit and objection to the defendants' motion for summary judgment. (Document # 16.) He argues that the defendants' assertions concerning access to the law library are misleading because . . . "the time listed in [the] affidavit of Warden Billy Mitchem . . . [is] when the library is open[, but Mitchem] failed to mention that these time slots are divided up by approximately 300 inmates, who are issued a law pass." *Id.* at 2. Therefore, an average inmate is able to spend about 2 hours (3 hours if it is a night pass) in the law library for 2 days during any given week. *Id.* Plaintiff also contends that W.E. Donaldson "doesn't have up-to-date material and when it arrives [it's] 8-10 months old . . . .[T]he law is a process of evaluation and by the time we receive the information [it's] either changing or has already changed." *Id.* at 4-5. Finally, plaintiff asserts that the law clerks in the law library are the functional equivalent of the 'blind leading the blind' because they are untrained. *Id.* at 5-6.

## ACCESS TO COURT

Plaintiff's allegations against defendants Mitchem and Etheridge regarding the violation of his constitutional right to access to court and legal assistance implicate the First and Fourteenth Amendments of the United States Constitution.

5

**First Amendment**

The Supreme Court in *Shaw v. Murphy,* stated that "[i]nmates retain . . . certain protections of the First Amendment . . . nonetheless, . . . the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large. In the First Amendment context, for instance, some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.'" 532 U.S. at 229 (other citations omitted). Having said that, "restrictions on inmate-to-inmate communications pass constitutional muster only if the restrictions are reasonably related to legitimate and neutral government objectives." *Shaw*, 532 U.S. at 228 (citing *Turner v. Safley,* 482 U.S. 78, 89 (1987)).

There are four factors which must be considered when applying the above standard to a prison regulation. "First, [the] regulation must have a logical connection to legitimate penological interests invoked to justify it." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987). Second, the court must consider whether "'alternative means of exercising the right . . . remain open to prison inmates.'" *Id.* at 351 (*quoting Turner v. Safley*, 482 U.S. at 89). The court must also examine "the impact that accommodation of [plaintiff's] asserted right would have on other inmates, on prison personnel, and on allocation of prison resources generally." *O'Lone,* 482 U.S. at 352. Finally, the court must ascertain whether an obvious, easy alternative to the current regulation exists, and, if such an alternative exists, whether that alternative can be implemented at a *de minimis* cost to valid penological interests. *Turner*, 482 U.S. at 90-91.

Defendants Mitchem and Etheridge state the new library policy continues to allow inmates to work on their own cases. The policy does not prohibit inmates from assisting one

another, but only prohibits inmates from using the law library to work on some other inmate's case. Moreover, "[i]nmates are allowed access to the Law Library on Monday through Saturday, 7:30 a.m.- 9:30 a.m.; 12:30 p.m. - 4:30 p.m.; 7:30 p.m. - 10:30 p.m and can also receive an extended pass if they are working on a case time limit." Mitchem affidavit, (Document #10 at 2.) The policy is being imposed for "the purpose of deterring inmates from personal gain by charging other inmates for doing their legal work . . . . [Additionally,] [t]he law library at Donaldson is very limited in the number of individuals that can utilize the law library at the same time; however, law clerks are available to provide assistance, if needed." *Id.*

The court finds that the policy is reasonably related to a legitimate, neutral governmental interest. It has been implemented because of undisputed space constraints at the law library and an undisputed need to protect inmates from potential abuses by "jail house lawyers" who profit from the inmates in the form of money or favors. Plaintiff is afforded an alternate route to access the court in the form of reasonable visitation hours at the law library and he does not deny that those hours can be expanded if time demands it. Further, the plaintiff is not prohibited from discussing legal theories with other inmates outside of the law library, nor are inmates prohibited from working on other inmates' cases outside of the law library. Contrary to plaintiff's assertion, the policy clearly does not prohibit inmates from assisting one another. Although plaintiff never relates that he found the law clerks in the law library to be incompetent through his personal experience, he complains that the law clerks are of no assistance to inmates, and that the law library is approximately 8-10 months behind in their receipt of cases. However, whether or not the clerks are helpful is immaterial as there are alternatives to inmate assistance in the library that the plaintiff can easily exercise. Further, an 8-10 month delay in the library's acquisition of new

7

decisions does not render the law library unconstitutionally infirm, particularly when it takes time to publish the opinions from the date they are issued.

To accommodate the plaintiff's wishes in this particular case would necessitate that the same concessions be granted to every other inmate in the plaintiff's position, a proposition which could result in continued monopoly of the law library by writ writers and the bartering of legal advice among prisoners. There does not appear to be an easy alternative to control the potential monopolization of the law library by writ writers, other than ensuring that inmates are working on their own cases. The plain purpose of the policy is to promote the legitimate penological objectives of maintaining control over the law library for the benefit of all prisoners and eliminate the pernicious side-effects of having inmates assist others for favor or reward. There is, however, is an easy and obvious alternative to library overcrowding. Expansion of the library and training programs for inmates/law clerks would help resolve the overcrowding problem, but the court does not foresee the possibility of such a change taking place at *de minimis* cost.

In the short, the policy of prohibiting inmates from using the law library to work on the cases of other inmates does not deprive the plaintiff of access to the library, nor does it prevent him from consulting with other inmates outside the library. The policy does effectively end the practice of some inmates undertaking to "represent" their fellow prisoners for money reward or favors. The balance between the right of the plaintiff to have effective access to court and the need of the institution to control "jailhouse lawyering" is properly struck by this policy. The policy is rationally related to legitimate penological goals and does not unreasonably limit the plaintiff's rights of access to the courts. As such, the plaintiff's First Amendment claims regarding access to court are due to be dismissed.

8

**Fourteenth Amendment**

The due process clause of the Fourteenth Amendment provides another potential foundation for plaintiff's assertion that the defendants' library policy violates his right to access to court. However, the right of access to court as defined in *Bounds v. Smith*, 430 U.S. 817 (1977), requires only that inmates be provided with some reasonable means by which they may bring their legal claims before the court. This can be accomplished by one of several alternatives, including the appointment of counsel, providing the assistance of other persons trained in the law, or providing access to a law library. It must be emphasized that these are all *alternative* ways of guaranteeing a prisoner's right of access to the court; they are not cumulative of one another.[1]

In *Lewis v. Casey*, the Supreme Court re-analyzed *Bounds* and set forth the following principles: (1) there is no free-standing right to a law library or legal assistance, only a right to access to court;[2] (2) this 'access to court' is not intended for all types of lawsuits: it is only to provide tools for grappling with attacks on sentences, directly or collaterally, and to challenge conditions of confinement;[3] (3) although *Bounds* did not specifically state that in order to have standing a plaintiff must satisfy an "actual injury" requirement, said requirement is a fundamental constitutional prerequisite;[4] and (4) assuming the plaintiff does have standing, *Bounds* must be interpreted in conjunction with *Turner v. Safley*, which states that a prison regulation impinging

---

[1] *See Lewis v. Casey*, 518 U.S. 343, 350 (1996); *Bounds v. Smith*, 430 U.S. at 830.

[2] *Id.* at 350-351.

[3] *Id.* at 355.

[4] *Id.* at 349.

on inmates' constitutional rights "is valid if it is reasonably related to legitimate penological objectives."[5]

While the phrase 'access to court' has been defined in (1) and (2) as either appointment of counsel, the assistance of other persons trained in the law, or access to a law library in connection with direct or collateral attacks on sentences and conditions of confinement cases, the question of how to define the "actual injury" prerequisite in (3) requires more elaboration. An analysis of actual injury in access to court cases necessarily involves entwining the nature of the claim itself as set out in (1) and (2) with a determination of whether that claim is actionable. *Lewis* defined "actual injury" in relation to those prisoners who have suffered or will imminently suffer, actual harm.[6] To determine whether there is or will be actual harm is a two-part test: First, are there adequate legal resources available and second, does plaintiff have an actionable claim?

*"Adequate" means "Capable"*

In *Lewis,* the Arizona Department of Corrections (ADOC) attempted to state that their constitutional burden was met when they provided an excellent law library and law clerks. The Supreme Court said that the ADOC's position misinterpreted *Bounds* in that *Bounds* "guarantees no methodology but rather the conferral of a capability - - the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts."[7] This is the touchstone. As such, when any inmate "shows that an actionable claim of this nature which he desired to bring has been lost or rejected, or that presentation of the claim is currently being prevented," . . .

---

[5] *Id.* at 362 (citing *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

[6] *Id.* at 349.

[7] *Id.* at 355.

10

his lack of capability demonstrates the failure to furnish adequate libraries or adequate legal help.[8]

*"Actionable claim"*

In finding that only non-frivolous claims are actionable claims, the majority in *Lewis* held that "[d]epriving someone of an arguable (though not yet established claim) inflicts actual injury because it deprives [a plaintiff] of something of value - arguable claims are settled, bought and sold. Depriving someone of a frivolous claim, on the other hand, deprives him of nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions."[9] The Eleventh Circuit has adopted the above standard, explaining:

> With respect to access-to-court claims, *Lewis* clarifies that a plaintiff first must show actual injury before seeking relief under *Bounds*. *See Bass v. Singletary*, 143 F.3d 1442, 1444 (11th Cir.1998). This essential standing requirement means that prison officials' actions that allegedly violate an inmate's right of access to the courts must have impeded the inmate's pursuit of a nonfrivolous, post-conviction claim or civil rights action. *See id.* at 1445. To prevail, a plaintiff must provide evidence of such deterrence, such as a denial or dismissal of a direct appeal, habeas petition, or civil rights case that results from actions of prison officials. *See id.* at 1446. Therefore, in an access-to-courts claim, "a plaintiff cannot merely allege a denial of access to a law library or adequate attorney, even if the denial is systemic." *Sabers v. Delano*, 100 F.3d 82, 84 (8th Cir.1996) (per curiam). Rather, a plaintiff must demonstrate that the lack of a law library or inadequate access to counsel hindered his "efforts to proceed with a legal claim in a criminal appeal, postconviction matter, or civil rights action seeking to vindicate basic constitutional rights." *Id.*

*Wilson v. Blankenship*, 163 F. 3d 1284, 1290-91 (11th Cir. 1998).

This court has carefully applied the principles of *Lewis* and its progeny to the case at hand and has determined that the plaintiff lacks standing. In doing so, the court recognizes that the

---

[8] *Id.*

[9] *Id.* at 353 and ftnte 3.

plaintiff does not have a free-standing constitutional right to a law library or legal assistance. As such, he cannot establish "relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. . . . [he] must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim."[10]

The particular genre of the underlying action that plaintiff seeks to pursue, a post-conviction remedy, is the type of action envisioned by *Lewis*. However, plaintiff has failed to demonstrate that the new library policy at WE Donaldson Correctional Facility has caused or will imminently cause him to suffer actual harm because he has not shown the present access he has to court is inadequate nor has he articulated an actionable claim. Specifically, plaintiff argues the law library is outdated, inadequate and the law clerks assigned to the library are untrained, thereby concluding that there is no adequate law library and adequate legal assistance available to him. However, because plaintiff is relying totally on prisoner assistance, it is unclear whether plaintiff has personally attempted to take advantage or is aware of the law library's substance even though he is not illiterate.[11] Further, plaintiff complains that the prohibition against inmates utilizing the law library for any legal research other than their own individual cases deprives him of adequate legal assistance. There are alternatives available to the plaintiff. Plaintiff does have access to the court in the form of reasonable visitation hours at the law library

---

[10] *Id.* at 351.

[11] In his complaint, the plaintiff argues "I didn't do any work on my Rule 32 petition nor do I know the strategy [of] the prisoner that's assisting me, as he continues to file the necessary paperwork . . . . I didn't even prepare this lawsuit, the prisoner whom they don't want helping me is doing it and violating the new policy as I write." (Document #1 at 5.)

12

and an opportunity to request additional hours if he is under a deadline. Further, the plaintiff is not prohibited from discussing legal theories with other inmates outside of the law library, nor are inmates prohibited from working on other inmates' cases outside of the law library. Plaintiff complains that the law clerks are of no assistance, and that there is an 8-10 month delay in the library's receipt of new cases. However, whether or not the clerks are helpful is immaterial as there are alternatives that the plaintiff can easily exercise, and an 8-10 month delay in the library's receipt of new cases and decisions does not render the law library unconstitutionally infirm, particularly when it takes time to publish the opinions from the date they are issued.

Even if this court were to find that the law library and the law library policy were constitutionally inadequate, the plaintiff has failed to demonstrate that he has an actionable claim. While he informed the court that he presently has a pending Rule 32 petition, he has failed to inform the court of any details regarding the petition or any errors which resulted in his underlying conviction. It is incumbent upon the court to determine whether or not the plaintiff's underlying Rule 32 claim is a nonfrivolous claim. The plaintiff has not "demonstrated that his Rule 32 petition is nonfrivolous" and, as such, his claims are due to be dismissed for failing to state a claim upon which relief may be granted. *Lee v. Jones,* 2001 WL 102364, 3, — F.Supp.— (S.D. Ala. 2001).

Assuming arguendo that the plaintiff survives the threshold question of standing (which this court does not believe he can do), the constitutional right of access to court that plaintiff is afforded in prison is limited by his status as an inmate. Even so, when the government seeks to limit this right, it must have a rational and legitimate penological reason for doing so. W.E. Donaldson Correctional Facility, through the affidavits of defendants Mitchem and Etheridge

demonstrate that the new policy was created because of the space limitations in the law library and to deter "[t]he bartering for legal services [which] presents enhanced risks of violence, extortion and other disciplinary problems throughout the facility." (Document # 10 at 1.) The court finds these to be neutral and rational reasons for the restrictions and that the restrictions are related to a legitimate penological interest in accordance with *Turner v. Safley* requirements.[12] Therefore, plaintiff's claims that the new library policy violates his right to due process of law are due to be dismissed.

## OPINION

Accordingly, for the reasons stated above, the motion for summary judgment filed on behalf of defendants Mitchem and Etheridge is due to be granted and all of the plaintiff's claims are due to be dismissed with prejudice.

An Order consistent with this opinion shall be entered contemporaneously herewith.

DATED this 25th day of March, 2002.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE

---

[12] For expanded discussion of *Turner v. Safley*, please see 'First Amendment' section *infra*, pages 5-6.